```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ALABAMA
                            MIDDLE DIVISION
```

FILED
01 JAN 17 PM 3:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JAN 17 2001

| | | |
|---|---|---|
| ALTMAN MACHINERY CO., INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. |
| SUNSTAR INDUSTRIES, INC., | ) | CV-00-AR-0457-M |
| Defendant. | ) | |

### MEMORANDUM OPINION

Before the court are cross-motions for summary judgment by defendant, Sunstar Industries, Inc. ("Sunstar"), and plaintiff, Altman Machinery Co., Inc., ("Altman Machinery"). The action comes about as a result of an underlying lawsuit for 'failure to warn' and breach of warranty pending in the Circuit Court of Etowah County, Alabama (*Joseph David Nelson v. CNB International, et al.*, CV-99-151-WWC), filed by David Nelson ("Nelson"), which names, among others, Altman Machinery and Sunstar as defendants. Nelson, an employee of Sunstar, allegedly injured his hand while operating a clearing press that was sold by Altman Machinery to Sunstar.

In the case *sub judice*, Altman Machinery claims that Sunstar breached its contract with Altman Machinery by refusing to indemnify Altman Machinery in the state court case. Altman Machinery seeks a declaratory judgment that it is entitled to be indemnified by Sunstar for all costs and expenses incurred in



defending the state court action., including any judgment entered in favor of Nelson. For the reasons set forth in the opinion below, Altman Machinery's motion is due to be granted, and Sunstar's motion is due to be denied.

## PERTINENT AND UNDISPUTED FACTS

Sometime in late August 1998, Sunstar, a manufacturer of metal components, commenced negotiations with Altman Machinery, a broker/dealer in used machine tools and fabricating equipment, for the purchase of a used clearing press. Initial negotiations between the parties occurred via telephone. Once the parties reached an oral agreement on price, the operating condition of the press and a delivery date, Altman Machinery on August 25, 1998, provided Sunstar with a written price quotation and a "Terms and Conditions" document via facsimile. The "Terms and Conditions" document contained a "Waiver-Indemnification" provision, which provides, in relevant part:

> [Sunstar] hereby (1) Waives, releases and discharges [any] and all claims . . . of every kind . . . , which it may have at any time against Altman, its agents or employees, by reason of or arising out of any condition or defect of the goods sold hereunder, including but not limited to any claimed improper design, specifications or manufacturing defect of goods sold hereunder, or devices; and (2) covenants to indemnify and hold harmless Altman, its agents and employees of, from and against any and all loss, damage, expense, claims, suits, costs of defense, including

> attorneys' fees or liability which Altman or any of its employees may sustain or incur at any time for or by any reason of any injury to or death of any person or persons or damage to any property, arising out of any condition or defect of the goods sold hereunder, including but not limited to improper design or manufacturing defect or other defect of the goods sold hereunder, or any claimed inadequate or insufficient safeguards or safety devices, or warnings.

Howard Altman ("Altman"), the sole owner of Altman Machinery, testified that when a prospective buyer asks for a price quotation on a particular machine, it is Altman Machinery's invariable custom and practice to issue a written quotation and a "Terms and Conditions" document:

> Q: What is your standard procedure as far as issuing quotes is concerned to [a] potential buyer?
>
> A: A customer, a potential buyer will call. . . . [P]eople will call and tell us what their requirements are, if we have something similar to what they're looking for, we will fax quotes to them.
>
> Q: Okay. Is this fax followed up by a mailed copy of the quote?
>
> A: No.
>
> * * *
>
> Q: Is this *terms and conditions document* something that is sent with every invoice or only certain items sold?
>
> A: It goes with every quote.

3

*Altman Depo.*, at 29-30, 34 (emphasis supplied). The "Terms and Conditions" document also contained, among other things, (1) a choice of law provision that specified, "[t]his agreement shall be an Illinois contract and shall be interpreted and administered for all purposes under the laws of Illinois"; and (2) a merger clause, that stated:

> All prior conversations and representations with reference to this subject matter are superseded by this agreement . . . [Sunstar's] purchase order is accepted expressly conditional on [Sunstar's] assent to the terms and conditions herein, as the complete and exclusive statement of the terms of this agreement, which assent shall be manifested by [Sunstar] accepting or retaining possession of the goods described herein.

According to Altman, if the customer agrees to the price and accepts the "Terms and Conditions" of the contract, then Altman Machinery issues the buyer an invoice for the machine.

Jerry Hart ("Hart"), owner of Sunstar, testified that he received in his office Altman Machinery's price quotation for the press and "Terms and Conditions" document via facsimile in late August 1998. *Hart Depo.*, at 21. At that time, Hart did not review or discuss the contents of these documents with Altman because Hart's office staff is instructed to file any quotations and companion documents received in his office without Hart reviewing them. Hart rarely, if ever, reads these documents because it is

4

his custom and practice that the terms and conditions of a sale are the oral representations made over the telephone between himself and the buyer or seller:

> Q: So as a reasonable and prudent businessman, after you have negotiated a price and then a document entitled terms and conditions comes from the seller of that product, I am hearing you tell me you don't read the terms and conditions?
>
> A: Well, if we have an agreement over the telephone and it seems to be very clear to both people involved in the transaction, then that's what I believe to be the terms and conditions.

*Hart Depo.*, at 29.[1] As hereinafter reflected, Hart expressed his belief that Sunstar is not responsible to honor obligations specified within these written documents because oral agreements govern his business dealings:

> Q: [Is it Sunstar's] position that if the terms and agreements, or that portion of it are representing or referencing indemnity was not discussed on the telephone, that your company doesn't owe Altman indemnity in this case?
>
> A: Well, if—if Altman was negligent in any

---

[1] Altman Machinery concedes that certain portions of the facsimile of the "Terms and Conditions" document were illegible. This fact is immaterial to the instant case, because Hart, himself, admitted that he rarely if ever reviews such documents. Assuming *arguendo* that the "Terms and Conditions" document was perfectly legible, Hart and his office staff would still have disregarded its contents due to Hart's business practices. Accordingly, Hart's own conduct fatally undermines his attempt to escape from the provisions of the "Terms and Conditions" document.

5

>             way pertaining to the press, then I
>             didn't have any control over that.
>
>     Q:      Right.
>
>     A:      You know, I can't be responsible.  I
>             don't believe, and I don't know what the
>             law says, I'm not a lawyer, I don't know
>             much about—had very little dealings with
>             the law at all.  The only thing I can say
>             is that I called up and talked to
>             Altman's son, and we agreed on the
>             condition that I wanted the press to be
>             in when I received it and the price and
>             that it was going to cost, and
>             approximately the week that I would
>             receive it, and we agreed on that and
>             that's—that's what happened.

*Hart Depo.*, at 40-41.

On August 28, 1998, Sunstar agreed to purchase the press from Altman Machinery, and on August 31, 1998, Altman Machinery issued an invoice to Sunstar for the cost of the press.  The invoice contained the following provision:

> <u>Occupational Safety and Health Act of 1970</u>: It
> is the purchasers responsibility to provide
> such devices, equipment and means as may be
> necessary or required to safeguard operators
> of machinery from harm resulting from any
> particular use, operation or set up, and to
> safeguard adequately the use of the above
> machine or machines to meet all Government
> Safety Standards.

Hart testified that he did not read the invoice when he received it from Altman Machinery: "Well, I can read it and under [the above referenced provision], but I thought that since, you know we had an

6

agreement on the phone that [Altman Machinery] was going to add . . . safety features to [the press], that it would come in that way and this [provision] wouldn't apply." *Hart Depo.*, at 54-55. Hart admitted, however, that the press had been inspected by Occupational Safety and Health Administration ("OSHA") representatives, and that the press conformed to OSHA's safety regulations on the date it was delivered to Sunstar.

On or around September 11, 1998, Altman Machinery delivered the clearing press to Sunstar. On November 4, 1998, Nelson, a Sunstar employee, was injured while operating the press. On February 4, 1999, Nelson filed a complaint in the Circuit Court of Etowah County, Alabama, naming, among others, Sunstar and Altman Machinery as defendants. For purposes of this action, Nelson claims that defendants (1) violated the provisions of the Alabama Extended Manufacturers Liability Doctrine in that the press "double cycled and cut off most of [Nelson's] left hand" (*Nelson Compl.*, at ¶12); and (2) breached an express and/or implied warranty because "the press was not reasonably fit for the purpose for which it was intended to be used" (*Nelson Compl.*, at ¶17).

On February 24, 2000, Altman Machinery filed the instant action claiming that Sunstar breached its contract by refusing to indemnify Altman Machinery in the state court case. Altman Machinery seeks a declaratory judgment that it is entitled to be

7

indemnified by Sunstar for all costs and expenses incurred in defending the state court action, including any judgment entered in favor of Nelson.

### SUMMARY JUDGMENT STANDARD

Rule 56(c), F.R.Civ.P. provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that this language means exactly what it says: there must be a **genuine** issue of **material** fact, not merely some factual dispute. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510 (1986). What this standard means in practice is that "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511 (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575 (1968)).

A motion for summary judgment should be denied "if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997)(quoting *Carter v. City of Miami*, 870

F.2d 578, 581 (11th Cir. 1989)). If, however, as a matter of law, a jury could not return a verdict for plaintiff, defendant's motion must be granted.

## DISCUSSION

### I. Choice of Law Provision

At the outset, the court must determine whether Illinois law governs the substantive aspects of this dispute. According to Altman Machinery, the contract between the parties should be governed by the substantive law of Illinois pursuant to the choice of law provision set out in the contract. Sunstar contends that Alabama law should control this action because Nelson's claims against Altman Machinery, for which Altman Machinery seeks indemnity, are controlled by the laws of Alabama.

The law in Alabama is well-settled concerning choice of law principles. In *Ex Parte Owen*, 437 So. 2d 476, 481 (Ala. 1983), the court held that, "Alabama follows the traditional view that a contract is governed as to its nature, obligation, and validity by the law of the place where it was made, unless the parties intend the law of some other place to govern, or unless it is to be wholly performed in some other place." *See also Morris v. SSE, Inc.*, 912 F.2d 1392, 1396 (11th Cir. 1990) ("In contract actions, Alabama applies the rule of *lex loci contractus*."); *Hughes Associates Inc. v. Printed Circuit Corp.*, 631 F. Supp. 851, 854 (N.D. Ala. 1986);

*New York Life Ins. Co. v. Scheuer*, 73 So. 409, 413 (1916) (noting that, "it is quite plain that the contract for the loan was, when made, and has continued to be, a New York contract, subject to the applicable laws of that state, . . . and certainly not an Alabama contract.").

In the case *sub judice*, the "Terms and Conditions" of the contract between the parties contain a choice of law provision which expressly provides that the "agreement shall be an Illinois contract and shall be interpreted and administered for all purposes under the laws of Illinois." Accordingly, pursuant to this choice of law provision in the contract and the general rule in Alabama interpreting such provisions, the contract will be construed in accordance with Illinois substantive law.

## II. INDEMNIFICATION

Altman Machinery asserts that Sunstar is obligated to indemnify Altman Machinery from the lawsuit brought by Nelson in the Circuit Court of Etowah County, Alabama, because the language of the indemnity provision contained in the contract is expressed in clear and unequivocal terms. *See Pla.'s Motion*, at 11. Sunstar contends that the indemnity provision is inapplicable because it, "does not specify in clear and unequivocal language that Sunstar agrees to indemnify Altman from its own negligence." *Def.'s Motion*, at 12-13.

The leading Illinois case interpreting indemnification provisions is *Westinghouse Electric Elevator Co. v. La Salle Monroe Bldg. Corp.*, 395 Ill. 429, 70 N.E.2d 604 (1947), which holds that "an indemnity contract will not be construed as indemnifying one against his own negligence, unless such construction is required by clear and explicit language of the contract, or such intention is expressed in unequivocal terms." *Westinghouse*, 70 N.E.2d at 607 (internal citations omitted).[2] The *Westinghouse* court further stated that "[i]t is a general rule governing the construction of contracts that unless a contract is ambiguous, its meaning must be determined from the words used." *Westinghouse*, 70 N.E.2d at 606. The question before this court, therefore, is whether this particular indemnity provision is a clear and explicit expression in unequivocal terms that Sunstar must indemnify Altman Machinery even if it was Altman Machinery's negligence that caused Nelson's injuries.

As set forth above, Altman Machinery's "Terms and Conditions" document contained a "Waiver-Indemnification" provision which

---

[2] Alabama courts construe indemnification provisions under virtually the same standard as Illinois courts: "If the parties knowingly, evenhandedly, and for valid consideration, intelligently enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, if expressed in clear and unequivocal language, then such agreements will be upheld." *Industrial Tile, Inc. v. Stewart*, 388 So. 2d 171, 176 (Ala. 1980). *See also Black Diamond Coal Mining Co. v. USX Corp.*, 581 So. 2d 839 (Ala. 1991).

11

required Sunstar to indemnify Altman Machinery from:

> any and all loss, damage, expense, claims, suits, cost of defense, [and] . . . attorneys' fees . . . arising out of any condition or defect of the goods sold hereunder, including but not limited to improper design or manufacturing defect or other defect of the goods sold hereunder, or any claimed inadequate or insufficient safeguards or safety devices, or warnings.

Nelson's state court complaint attributes liability to Altman Machinery by alleging that the press was "in a defective condition and/or in a condition that was not reasonably safe to the user." *Nelson Compl.*, at ¶12. Nelson also alleged that the "press was not reasonably fit and suitable for the purpose for which it was intended to be used, but to the contrary, said press was in a dangerously defective and unsafe condition." *Nelson Compl.*, at ¶17.

The court finds that the operative language contained in the "Waiver-Indemnification" provision is a clear, unambiguous, concise and explicit expression that Sunstar is contractually obligated to indemnify, and hold harmless, Altman Machinery in Nelson's state court case. *See Westinghouse*, 70 N.E.2d at 607. Nelson's claims against Altman Machinery are precisely the types of claims that this indemnification provision is intended to cover.

## CONCLUSION

Hart would like this court to conclude that his oral

12

representations control the terms of the contract rather than the "Terms and Conditions" document. Hart's apparently sincere, yet sorely misplaced belief that his oral representations, rather than written agreements, should govern his contracts harkens to some bygone era, one which the court has a hard time recalling. Hart's 'head-in-the-sand' approach cannot provide Sunstar an escape from its contractual obligations. Sunstar cannot ignore or disregard documents that contain key contractual provisions. There is no evidence of disproportionate bargaining power of the sort that would provide an escape for Sunstar, and, in fact, Sunstar makes no attempt to attack the contract on this basis. The parties knowingly, evenhandedly and for valid consideration entered into an agreement whereby Sunstar agreed to indemnify and hold harmless Altman Machinery against Altman Machinery's own wrongs.

A separate and appropriate order will be entered in accordance with this opinion.

DONE this  17th  day of January, 2001.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE